AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| v. | ) |
| | ) Case No.  1:25-MJ-18  (DJS) |
| JEAL SUTHERLAND, | ) |
| Defendant. | ) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. In or around December 2024 and January 2025, in the county of Albany in the Northern District of New York, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958(a) | Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire |

This criminal complaint is based on these facts:
See attached affidavit.

☒ Continued on the attached sheet.

_____
Complainant's signature
FBI SA Brian P. Jacob
Printed name and title

Attested to by the affiant in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Date: January 27, 2025

_____
Judge's signature

City and State:  Albany, New York

Hon. Daniel J. Stewart, U.S. Magistrate Judge
Printed name and title

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

Special Agent Brian P. Jacob, of the Federal Bureau of Investigation (FBI), being duly sworn, deposes and states:

### INTRODUCTION

1.   I respectfully make this affidavit in support of a criminal complaint charging Jeal SUTHERLAND with the use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958(a).

2.   Your affiant has been an FBI Special Agent since February 2003. In 2005, I was assigned to the Safe Streets Task Force (SSTF) in Washington, D.C. where I primarily worked on violent gangs and narcotics matters. In 2011, I was transferred to the FBI's Albany Field Office and assigned to the white-collar crime squad in that office. In June 2020, I became a supervisor of the white-collar crime squad in Albany where I led a team of investigators, analysts, and professional support staff. In November 2024, I voluntarily stepped down as an FBI supervisor and was assigned to the SSTF in Albany. I have been tasked to investigate organized crime, drugs, and violent crimes in the greater Albany area. During my career, I have gained training and experience investigating all types of federal white-collar, violent crime, and narcotics matters.

3.   As an FBI Special Agent, I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of offenses enumerated in 18 U.S.C. § 2516(1). Accordingly, I am authorized to seek criminal complaints for Title 18 criminal offenses, including violations of 18 U.S.C. § 1958(a). That statute provides in pertinent part that: "Whoever . . . uses or causes another to . . . use . . . any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as

1

consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value" is guilty of a crime.

4.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other law enforcement officers and witnesses. The information contained in this affidavit is not an exhaustive account of everything I know about SUTHERLAND or everything I have learned in this investigation. Rather, it contains only the facts that I believe are necessary to establish probable cause in support of a criminal complaint. Where statements of others are related in this affidavit, they are related in substance and in part and transcriptions of recordings are based on the FBI's preliminary analysis of those recordings.

## PROBABLE CAUSE

5.     In November 2024, the FBI learned that Confidential Source-1 ("CS-1") was being investigated by state authorities for setting fire to a vehicle.[1] During a November 21, 2024 interview, CS-1 told authorities that SUTHERLAND had requested that he set fire to a vehicle because it belonged to the mother of Individual-1, a New York State prisoner who shares a child with SUTHERLAND's current romantic partner, Individual-2. CS-1 said that the purpose of setting fire to the vehicle was to prevent Individual-1's mother from testifying at a custody hearing concerning the child. CS-1 also explained that SUTHERLAND has provided him with employment and loans for the past several years. In exchange, CS-1 has acted as an "enforcer" for SUTHERLAND, including being tasked with intimidating people who owe SUTHERLAND money.

---

[1] CS-1 has a criminal history that includes a conviction for murder. CS-1, who admitted a history of drug use to investigators, is currently on lifetime parole and cooperating with investigators in exchange for leniency in connection with state criminal charges.

2

6.  During the same interview, CS-1 told investigators that SUTHERLAND had requested that CS-1 kill Individual-1 following Individual-1's release from prison, which was expected to be on or around January 28, 2025. The FBI subsequently initiated an investigation into SUTHERLAND's plan that involved, among other things, several recorded meetings between CS-1 and SUTHERLAND. CS-1 understood that SUTHERLAND would forgive debt that CS-1 owed to SUTHERLAND as consideration for the murder.

7.  Through several recorded meetings in December 2024 and January 2025, CS-1 and SUTHERLAND discussed a plan in which CS-1 would murder Individual-1 and dispose of the body at a hog farm in Pennsylvania using a rented van. Below are relevant excerpts of these conversations.

8.  On December 28, 2024, the following conversation took place:

CS-1: So, good to see you though because we have a few things to talk about that we can't talk on the phone about.
JS: Whats up?
CS-1: So this guy won't tell me yes or no if our friend is getting out of prison or not on the 26th. Won't tell me.
JS: You scared they got your fucking phone number calling in there and then all of a sudden he shows up dead?
CS-1: Oh no he's not going to show up dead dude. That's the stupidest thing in the world man. If he shows up dead. I'm going to tell you why. Two things, one is [Individual-2], ok, just saying, not saying that she would ever tell but... she has a big mouth.
...
CS-1: So, cause, I mean you never know, he shows up dead and [trails off]
JS: She's the first one that's getting questioned.
CS-1: Well that would be probably true. That's why we don't ever want him to show up period. We just want to know that he's gone. That you know he's gone. Not that somebody said he's gone that you know he's gone. So, I have a van that I can rent for like $250 from a nun [Sister-1]. We take him to a farm and let the hogs eat him. Now you can go with me if you want.
JS: I'll be probably in Myrtle Beach that day.
CS-1: (laughs) I get it. But you can go with me if you want.
JS: No, [Individual-2] wants him fucking strapped to a chair so she can hit him with a baseball bat. But you know what, she would fold like an accordion.
CS-1: We don't know, I mean I don't know, I don't know, I don't trust that she can keep

3

| | |
|---|---|
| | her mouth shut. That's a fact. So that's why that you know he's gone, um, I need, I'm going to buy a burner, gonna buy a burner phone, you buy a burner phone. All right. |
| JS: | mhmm. |
| CS-1: | This way you can actually see the pictures and get rid of the phone. You can buy a phone with cash right? |
| JS: | Absolutely. |
| CS-1: | Ok, good, you don't have to buy one with [trails off] |
| JS: | Send somebody in to buy it. |
| CS-1: | I don't think you want to involve anybody else. |
| JS: | Other people that cash checks for me, handle this I need you go buy me a phone. |
| CS-1: | Well have them buy two phones then. |
| JS: | Ok. |
| CS-1: | All right. Or give me the money I'll buy it. I'll have a crackhead pay for it. So, we give Sister[-1] the $250 for the fucking van, she got an E-ZPass on it. |
| JS: | I don't know how you are going to be able to plan all this shit to happen in one day it could take 10 different days of tries and [trails off] |
| CS-1: | No it's not going to take, it's going to be like yo do you want to come work for me, ok, you want to come work for me, ok, I'm meeting him at parole on the 26th. You know I'm going to parole waiting on him, I meet him at parole, I know how, listen, you looking for work. I pay cash every day, $100. What, ok, here's my number, burner phone, calls me up, boom. I pick him up in the morning. |
| JS: | Ok, that's more than I want to know. |
| CS-1: | Ok. |
| JS: | I just changed my mind. |
| CS-1: | Oh, you don't want him dead now? |
| JS: | Oh, no, I don't want him, I don't want to know anything about it. |
| CS-1: | Oh, ok. Well you want to see, you want to see the proof he's dead? |
| JS: | Of course. |
| CS-1: | Ok, well I mean shit, I'm just letting you know that's how it's going to go. |
| JS: | Listen [trails off] |
| CS-1: | All in one day. |
| JS: | The fucking firebomb has this lady so fucking scared that she didn't pay her mortgage now it's getting foreclosed. It's fucking on the market as a bank owned fucking house so he may not have a house to go back to. |

Based on my training, experience, and knowledge of this investigation, I understand that the above conversation concerns planning Individual-1's murder. CS-1 explains to SUTHERLAND how he would conduct the murder to which SUTHERLAND says that he does not want to be present for the murder although he does want photographic evidence that it occurred. SUTHERLAND adds a reference to the arson that CS-1 committed to intimidate Individual-1's mother, which shows

4

that SUTHERLAND is aware of it.

    9.    On January 3, 2025, the following conversation took place:

CS-1: This thing is going to disappear, he's dying. So, it's already set in motion I'm going to do this shit he's gone.
JS: Good
…
CS-1: Ok, you gonna need $250 for a van and you're gonna need $1000 for the fucking hog farmer, that's it.
JS: I don't know how you are going to pick the day that you are going to get the van and do this, what if you can't find him, we don't know where he's staying.
CS-1: Dude, there's only two places he's going, alright, and I'll have his address, I'll have his address, only two places . . .
JS: He's going to be on parole? Cause he had two and a half to four, he did his two and a half [trails off]
CS-1: Yeah he's going to be on parole for the rest of the time.
JS: Ok.
CS-1: Yeah. But we're taking him out no body no fucking no evidence no nothing. So we're going to do $250 for the van, $1,000 for the hog farmer and that's it, and I need an E-ZPass. I don't know, I'm not going to get one in my name. I'm sticking it on the van.
JS: I gotta get somebody else to get it.
CS-1: There you go, I mean boom, that's it. Did you order them for your company?
JS: Yeah, but they are going to track it.
CS-1: How are they going to track it, they ain't nobody going to know there's a body in there unless you tell them. How the fuck is anybody ever going to know?
JS: All right, I got an idea.
CS-1: Ok, who the fuck is ever going to know that anything about this unless you tell [Individual-2] and then [Individual-2] will tell the whole fucking world. Cause she'll tell her fucking fat ass mom. So we don't want nobody to say shit about nothing, nobody knows, nobody is helping me do nothing. I have no co-defendants. You understand? That's how you get caught.
JS: It's pretty hard to pick up a guy that's 200 pounds, isn't it?
CS-1: Dude when he's got a bullet in his head it's not hard to pick up nobody.
JS: When he's got what?
CS-1: A bullet in his head.
JS: Oh, it's not?
CS-1: No, not at all. Going right in the back of the van. That's why the van's for man. I mean if anything man if I got to I'll, I'll set the van on fire and blow it up. What happened? I don't know what happened Sister[-1]. You know. You got insurance, don't you? But by then I'm back in New York. You know it's right across the Pennsylvania border it's not far at all. All you gotta do is drive fucking with no speed limit no nothing I got it mapped out. He's dead. That way I take care of [Individual-3], I take care of you, I get a little bit of change for myself. All right dude.

5

....
CS-1:  And I mean I told you, we have a burner phone, right, we need a burner phone, you know why we need a burner phone.
JS:    You didn't tell me
CS-1:  Well I want to see if you are smart enough to figure it out.
JS:    I don't know
CS-1:  So you can actually see pictures of this n[-word] dead.
JS:    oh, ok, good.
CS-1:  (laughs) That's why we need two burner phones. All right.
JS:    Listen, it stays on my phone if you send it to me, so don't send me [trails off]
CS-1:  I'm not sending you nothing on your phone, a burner phone dude.

Based on my training, experience, and knowledge of this investigation, I understand that the above conversation concerns planning Individual-1's murder, including the use of anonymous "burner" cell phones, payment to CS-1 for expenses related to the murder, and potentially destroying the rented van after the murder is completed.

10. On January 24, 2025, a consensually monitored meeting was held with CS-1 and SUTHERLAND.[2] SUTHERLAND requested the meeting to cash a check at a Colonie, New York credit union. CS-1 met with SUTHERLAND near the credit union. CS-1 then entered the credit union and cashed a check for a currently unknown amount made out in CS-1's name. CS-1 was paid $100 for cashing the check. CS-1 and SUTHERLAND then discussed the murder of Individual-1. CS-1 advised SUTHERLAND that payment to the hog farmer would cost $1,000 and payment for the van would be $250. SUTHERLAND stated that he would get burner phones that evening. SUTHERLAND and CS-1 also discussed forgiveness of, *inter alia*, CS-1's debt of approximately several thousand dollars to SUTHERLAND in connection with the planned murder. During this meeting, SUTHERLAND and the CS-1 called an FBI Special Agent (the "UC") acting in an undercover capacity as the hog farmer. During this conversation, the UC and CS-1 spoke

---

[2] Transcripts of this meeting and the subsequent meetings described below have not yet been prepared. Accordingly, the accounts here are based on investigators' real time observations of recordings, my preliminary review of the recordings, and debriefings of CS-1.

6

about CS-1 coming to the farm and the UC demanded advance payment for use of the farm, explaining "I'm going to need something up front but I got the space man." CS-1 agreed to this condition and offered the farmer "booze," prompting the UC to request "a good bottle of bourbon."

11.     On January 26, 2025, SUTHERLAND and CS-1 met for breakfast at a Watervliet, New York restaurant. Following breakfast, CS-1 and SUTHERLAND drove to a bowling alley in Latham, New York. SUTHERLAND provided CS-1 with a cell phone in the parking lot. SUTHERLAND and CS-1 were then joined by Individual-2 and her child for bowling. CS-1 reiterated to SUTHERLAND that he needed money for the hog farmer and the van in order to proceed with the murder. SUTHERLAND told CS-1 to follow him to a Schenectady, New York address associated with SUTHERLAND's relative. CS-1 went to that address. While there, SUTHERLAND provided CS-1 with an E-ZPass transponder, a bottle of Wild Turkey bourbon for the hog farmer, and $1,450 cash. Based recorded discussions between SUTHERLAND and CS-1, I understand that the $1,450 accounts for $1,000 for the hog farmer, $250 to rent the van, and $200 for fuel costs to and from the hog farm in Pennsylvania.

## CONCLUSION

12.     Based on the foregoing, I respectfully submit that this affidavit establishes probable cause to conclude that Jeal SUTHERLAND has violated 18 U.S.C. § 1958(a) (use of interstate commerce facilities in the commission of murder-for-hire).

Attested to by the affiant:

*[signature]*

Brian P. Jacob
Special Agent
Federal Bureau of Investigation

7

I, the Honorable Daniel J. Stewart, United States Magistrate Judge, hereby acknowledge that this affidavit was attested by the affiant by telephone on January 27, 2025 in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

_____
Hon. Daniel J. Stewart
United States Magistrate Judge